IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00214-CR

No. 10-04-00215-CR

 

Terry Edward Carrington,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 163rd District Court

Orange County, Texas

Trial Court No. B-010065-R

Trial Court No. B-010370-R

 



MEMORANDUM  Opinion



 

          In these two appeals of his probation
revocation, Appellant Terry Carrington asserts in one issue that the evidence
was insufficient to revoke his probation for felony driving while intoxicated. 
We will affirm.

Background

          Carrington was charged with two
separate felony DWI offenses (occurring on September 1, 2000 and October 3,
2000, respectively).  On September 5, 2001, Carrington pled guilty to both
offenses, and the trial court sentenced him to ten years in prison for each
offense.  The sentences were suspended and Carrington was placed on community
supervision (probation)[1]
for eight years.  On the evening of February 8, 2004, Carrington was arrested
for DWI.  The State moved to revoke his probation in each case.  After a
hearing, the trial court revoked his probation and sentenced Carrington to ten
years in prison.  Carrington appeals, asserting that the evidence was
insufficient to revoke his probation.

Standard of Review

     Once granted, probation should not be
arbitrarily withdrawn by the trial court; the trial court is not authorized to
revoke probation absent a showing that the probationer has violated a condition
imposed by the court.  DeGay v. State, 741 S.W.2d 445, 449 (Tex. Crim.
App. 1987).  The State’s burden of proof in a revocation proceeding is by a
preponderance of the evidence.  Cobb v. State, 851 S.W.2d 871, 873 (Tex.
Crim. App. 1993).  The trial judge is the sole trier of the facts, the
credibility of the witnesses, and the weight to be given their testimony.  Ex
parte Tarver, 725 S.W.2d 195, 198 (Tex. Crim. App. 1986); Diaz v. State,
516 S.W.2d 154, 156 (Tex. Crim. App. 1974).  When the State has failed to meet
its burden of proof, the trial court abuses its discretion in issuing an order
to revoke probation.  Cardona v. State, 665 S.W.2d 492, 493-94 (Tex.
Crim. App. 1984).  We review an order revoking probation by determining whether
the court abused its discretion.  Id.

We have previously held that sufficiency points
are not independent grounds of review in an appeal of a probation revocation
order, but are incorporated into a determination of whether the trial court
abused its discretion.  Brumbalow v. State, 933 S.W.2d 298, 300 (Tex.
App.—Waco 1996, pet. ref’d).  When the sufficiency of the evidence to support the
trial court’s order is challenged, we review the evidence in the light most
favorable to the trial court’s findings.  Id.

The Evidence

District Attorney Investigator Wade Robinson
testified that on the afternoon of February 8, 2004, he was driving to the Orange County Airport on Highway 105, a two-way road.  Carrington’s truck was two cars in
front of him.  The car in front of Robinson tried to pass Carrington, and while
doing so, Carrington veered into the lane of oncoming traffic, which caused the
car to make a wide pass to get around Carrington.  Robinson then began to try
to pass Carrington, whom Robinson said was driving slowly, but Carrington ran
off the highway to the right, came back on the highway, and completely crossed
into the lane of oncoming traffic.  Robinson said that he feared Carrington was
going to have a head-on collision, so he stopped Carrington by activating his
emergency lights.

Robinson testified that Carrington stopped
quickly and that he asked Carrington for his driver’s license and insurance
information.  Robinson said that Carrington “was very slow” to answer his
questions and had a hard time getting his license out of his wallet.  Robinson
asked Carrington why he was running off the road, and Carrington told him he
had been working seven days straight.  Robinson asked Carrington to step to the
rear of his truck, and he noticed that Carrington was unsteady on his feet
while they were talking.  He said that Carrington had slurred speech and had to
lean on his truck.

Robinson asked Carrington if he had taken
anything because he felt that Carrington was intoxicated, and Carrington said
that he had taken a certain number of “Somas” and some other prescription
medication.  Because Robinson was in a hurry to catch a flight at the Orange County Airport, he initially decided not to arrest Carrington and instead called
Carrington’s wife and told her to come get him or he would be taken to jail. 
But before Carrington’s wife arrived, Robinson had changed his mind.  Robinson
testified that Carrington revealed that he was on probation for DWI and that he
could prove that he was not intoxicated by blowing in his car’s interlock
ignition device.  Robinson determined at that point that Carrington was
intoxicated by taking prescription drugs, that he did not have the normal use
of his mental or physical faculties, and that he should be arrested for DWI or
further investigated for DWI.  State Trooper Robert Arnold was called to the
scene, and when Arnold arrived, Robinson went on to the airport.

Arnold
testified that when he arrived at the scene of the stop, he spoke with Robinson
about the reason for the stop and what Robinson had found.  Arnold said that
when he arrived, Carrington was leaning against his truck, and when he asked
Carrington to come toward him, Carrington had to catch his balance as he walked
toward Arnold.  Arnold said that Carrington was unsteady on his feet.  Arnold noticed Carrington “lift his shoulder,” which he said was a sign of being
intoxicated or impaired.  Arnold also noticed that Carrington’s eyes were “half
shut” and that he had slurred speech.

Arnold
said that he did not smell alcohol on Carrington’s breath and that Carrington
said that he had not been drinking.  Carrington told Arnold that he was on his
way to work and that, right before being stopped by Robinson, he had just run
off the road and realized that he was in no condition to be driving to work and
that he was about to turn around when he was stopped.  Arnold also said that
Carrington told him that he felt like he could not make it to work safely.  Arnold asked Carrington whether he had taken any drugs, and Carrington responded that he
was on medication.  Arnold then asked Carrington if he had the medication with
him, and Carrington reached into a pocket to try to retrieve a pill bottle, but
 Arnold said that Carrington had such trouble that he had to get the bottle
out for Carrington.

Arnold
said there were two different medications in the bottle, and that one was
Soma.  Carrington told Arnold that he was actually on three medications but
that he only had two of them with him, and Carrington told him that he had
taken four Soma pills and four “Vicodin” pills that day.  A nurse later
confirmed to Arnold that the two medications were Soma and Vicodin.  Carrington
told Arnold that he had taken the medications that day for injuries he had
received in car and work accidents.  

At the scene, Arnold performed a horizontal gaze
nystagmus test on Carrington to detect alcohol intoxication, and he said that
Carrington did not exhibit any clues of alcohol intoxication.  Because of the
location of the stop (near a blind curve) and because there was no flat
surface, Arnold did not conduct any other field-sobriety tests on Carrington.  Arnold believed that Carrington had lost his normal mental and physical faculties, based
on Carrington’s leaning on his truck, having trouble standing, slurred speech,
and half-closed eyes.

Arnold
spent about twenty minutes at the scene with Carrington, and it took another
ten or fifteen minutes to take him to the Orange County Jail.  At the jail, Arnold took Carrington to the DWI video room for further testing for intoxication and
possibly to charge him with DWI.  The videotape shows Carrington performing a
variety of sobriety tests.

On the videotape, Carrington stated that he had
taken four pills of each medication.  He testified that he meant that he had
taken them over the day and the previous night.  He explained that he had slept
about three hours Saturday evening, had stayed up all of Saturday, and had
started taking his medication on Saturday evening around 3:00 or 4:00 p.m. 
Carrington added that he had not worked that night; he had stayed up playing
video games with his kids.  He had been working nights seven days a week since
early January, and this Saturday night was the first night he had taken off.

On the walk-and-turn test, Arnold noted that
Carrington used his arms to balance and that he took the wrong number of steps,
which Arnold said were clues of intoxication.  Arnold also said that Carrington
walked with a stiff gait and appeared unsteady.  Carrington satisfactorily performed
the nose-touch test and was cooperative throughout the testing, according to Arnold.  Arnold said that while he thought Carrington’s speech was still slurred on the
videotape, it was not as slurred as it had been at the roadside stop.

Because Arnold thought that Carrington was
intoxicated by prescription medication and not alcohol, he offered him a blood
test, rather than a breath test, which Carrington had agreed to take.  Arnold said that at the jail, Carrington was offered a blood test, but he refused to take
it.  Carrington testified that he refused because he thought it would be taken
at the jail instead of at a hospital.  He said that he did not agree to a blood
test at the jail because he had had a previous bad experience with blood being
drawn by jail personnel.  He also claimed that he had agreed to a blood test at
the roadside stop and thought that he would be taken to a hospital for it. 
Robinson denied that Carrington had agreed to a blood test at the stop scene.

After watching the videotape, Arnold said that
it was Lorcet, not Vicodin, that Carrington had said he had taken.  Katherine
Morgan, Carrington’s probation officer, testified that Soma was a muscle
relaxer and that Vicodin and Lorcet are opiate narcotic pain medications.

Carrington testified in his defense.  He said
that in the five weeks before his arrest, he had been working seven days a week
and ten- and twelve-hour night shifts, usually from 7:00 p.m. to 5:30 a.m.  As
a result, he said that his days and nights were backwards and that he would
sleep as much as he could during the day, which he said was three to five hours
at the most.

Carrington testified that the day of his arrest
was a Sunday and that he had not slept Saturday night (on which he had a day
off from work) or on Sunday, except for a one-hour nap between approximately
4:00 and 5:00 p.m. on Sunday.  Carrington had his two children with him that
weekend, and he had spent the weekend visiting with them.

Carrington explained that the three prescription
medications that he was taking at the time were Soma, Lorcet, and Xanax.  He
said that he had been in a car wreck several years ago, that he had a pinched
nerve, and that he had been on the medications since October 2003.  He was
unsure of how many pills he had taken on the day of the arrest, but he said that
he took them every “four hours or so,” as they were prescribed, and that he had
taken three, four, or five of the pills that day.  Carrington said that he did
not abuse his medication and only took them as prescribed.

Carrington said that on the day of his arrest,
he had last taken one of each medication around 1:00 p.m. and that he had left
his house for work around 6:15 p.m.  When he was pulled over, he was about ten
minutes away from his house.  Carrington admitted that he had driven off the
road, and he explained that he drove off the road because he was “very tired,
sleepy, physically and mentally exhausted.”  He further said that to work so
many hours on so little sleep, he would drink energy drinks, but he had not had
any drinks that day.

Carrington testified that he was cooperative
with the officers because he was not intoxicated; he said that on previous DWI
arrests he had not cooperated on the sobriety tests. Carrington admitted that
he told the officers that he was too tired to be driving and that he had
decided that he was going to return home and not drive to work.  He later added
that his plan was to return home and try to get a ride to work, despite his
being so tired, because he would drink his energy and caffeine drinks to be
able to do his job.

Carrington denied being intoxicated; he said
that he was only physically and mentally exhausted and that the medications had
no role in his condition.  He testified that he had worked “forever” while
taking the medications and had never had a problem, and that the medications
did not cause him to lose the normal use of his mental faculties.  As for the
problem identified by Arnold in the heel-toe walking test, Carrington said that
he attributed it to his tiredness and to what he was wearing:  steel-toed boots
and two pairs of socks, a Nomex suit and multiple layers of clothing underneath
to stay warm while working outside.

Analysis and Conclusion

 Viewing the evidence in the light most
favorable to the trial court’s findings, and deferring to the trial court’s role as the sole trier of the facts, the
credibility of the witnesses, and the weight to be given their testimony, we find that the trial court did not abuse its
discretion in finding sufficient evidence of a violation of Carrington’s conditions
of community supervision.  Cf. Davy v. State, 67 S.W.3d 382, 396 (Tex. App.—Waco 2001, no pet.) (“Davy does not dispute that he performed poorly on the
sobriety tests both at the side of the road and at the jail.  He does not
dispute that he had ingested prescription medications on the date in question. 
The jury was free to disbelieve his testimony that his performance on the
sobriety tests was due to his lack of sleep and his “bad leg” rather than the
medications. Accordingly, we conclude that the evidence is legally and
factually sufficient to support the verdict.”).

The trial court’s revocation orders are
affirmed.

 

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

Affirmed

Opinion
delivered and filed August 24, 2005

Do
not publish

[CR25]








 









    [1]       Both
parties’ briefs refer to community supervision as “probation.”  We will follow
suit.